↾ ECKERT and others *against* ECKERT and others.

APPEAL.

To take a case out of the statute of frauds and perjuries, proof must be given of the parol contract, relied on, having been *first* made, before the part performance took place.   If possession be taken of land, and improvements be made on it, and afterwards the owner by *parol* sell or give it to the tenant, such sale or gift will not transfer the title.

Where a party claiming to have land under a parol contract made after he came into possession of it, has made improvements, and has been fully compensated for them, a specific execution of the contract, it seems, would not be decreed.

Where a son is permitted by his father to enter upon the possession of a part, or the most valuable portion of his father's real estate, and make valuable, and permanent improvements, it is not to be referred to the son's having become the owner of the estate, either by gift or sale from the father, without clear and satisfactory testimony to authorize such conclusion.

In such cases the transaction generally results from the confidence which exists between the father and son, that the father will provide for the son in his will, which is perfectly consistent with the father's salutary retention of the title to the land.

In an ejectment brought by one of several children, after the death of the father, in which the plaintiff claims the land by virtue of an alledged parol gift or sale, possession taken, and improvements made, the will of the father devising the land from the plaintiff, is evidence, as without it, the plaintiff might recover as heir at law, although he failed to establish such gift or sale.

In such a case where no direct evidence was given of any gift or contract at the time the son took possession of the land, it is competent for the defendants to prove, that at the time of such possession taken, the father suffered the son to take with him, almost all his stock, and farming implements from another farm on which they had resided.

Where no evidence was given that a gift or sale of such stock and farming implements was made by the father to the son, it is not competent for the plaintiff, to repel such testimony as that given, to prove that he had worked for his father after he come of age and the value of his services.

The Court are not bound to require a party who offers evidence, to reduce his offer to writing.

Appeal from the Circuit Court of *Lebanon* county, held by his Honor, Justice Huston.

It was an ejectment for a tract of one hundred and seventy-five acres of land, brought by *Margaret Eckert*, *Polly Eckert* and *Louisa Eckert*, who were minor children of *Peter Eckert*, deceased, and sued by their guardians, against *George Eckert*

(Eckert, & others, *v.* Eckert & others.)

*George Boyer* and *Samuel Fisher.* The plaintiffs made title to the land by an alleged parol contract or sale, made by *Philip Eckert*, deceased, to *Peter Eckert*, his son, accompanied by possession, and improvements made upon the land. 'A former ejectment had been brought against the plaintiffs in this, in which a verdict and judgment was recovered against them, which was taken by appeal from the Circuit Court, in which it was tried, and affirmed in the Supreme Court. The opinion of the court in that case is subjoined in a note to this.

*Philip Eckert* the father of *Peter Eckert* had eight children; he survived *Peter*, but died before this suit was brought. The following evidence was given in the cause.

## Testimony of the Plaintiffs.

*Christian Bricker*—I walked down the road to see a triangular piece of land; the old man stood before his house at the road, and asked me which way I was going. I said I was going to see this tract of land, I wanted to buy it if I could get a contract. He said he had nothing to do with it, if I wanted to buy it I must go to *Peter.* I went to *Peter's* house after I saw the land; when I came there, the old man was there also. Then I tried to make a bargain with *Peter* and did not agree. *Peter* said it made no matter, he would be down soon and pass my house, and then perhaps we could make a contract. After some time *Peter* came into my house on his way to town—then I had bought another tract. This was in eighteen hundred and twenty four, in March or April. The old man when I met him at *Peter's* house, told me that he had often told *Peter*, or advised *Peter* to sell it; that if he was in *Peter's* place he would sell it, as it was cut off by the canal, it was unhandy. The old man and I often talked of the land. He said *Peter* wanted to pay money on the land, and he refused to take it; he had money standing out himself, and some he was afraid he would lose, and therefore he would not take it. He said he had made a will and *Peter* need not pay any thing until after his death. That he had given it to him in his will, and he was to pay yearly a certain sum, the amount witness does not recollect. He said he had given it at twenty-five hundred pounds, but the canal had done it damage, and if no damages were recovered, his estate would have to pay five hundred pounds back. This was before I intended to purchase. He told me more than once how much *Peter* was to pay yearly. I have forgotten it. I was at the old man's and worked there after eighteen hundred and twenty-four. He said the Mases lived on that land, and that spited him, as they never had paid him for it—this was after *Peter's* death. He said he would willingly see the children have it if one of them was a boy. He had made his last will but had now torn it, and made another one. I

lived half a mile from *Philip* eleven years. *Peter,* as much as I know, built a house and smoke house, both of rough stone and a granary in the barn. I do not know that *Peter* planted any orchard. He made fences on the land and cleared a patch of land.

I do not know that Peter paid the old man rent for the land, the old man said Peter built a new house. Philip had children, six daughters, and two sons, George and Peter. Philip said nothing about Peter having this farm, and his daughters nothing. He never talked about the children. I was not at Peter's when the house was building, except on Sundays. Philip said Peter might build it as he pleased. I do not know who bought and paid for the timber. Peter hauled it, the old man for a long time before had no team. I do not know that Peter got the horses and farming untensils when the old man quit farming. I do know he got the old man's horses, &c. whether he paid for them I do not know. The old man made no vendue when he quit farming. I do not know who owned the personalproperty. Peter owned some, and the old man some. The old man lived two miles from this place. The old man moved away from the old place to the one where he died two miles from the old place. George lived on the old place before the old man moved away. The old man had his horses, stock and farming utensils at the old place: he had only one horse after he moved and two cows, and no farming utensils. George moved from this place in dispute to the old place and Peter to this now in dispute. Philip said he would give the old place to George as he could pay for it better, as he had kept house longer.

*George Lose.* I and one *Joseph Bricker* built the house, so much as I know, for Peter; when I went to make the bargain *Joseph Bricker* was with me, the old man was then at Peter's, no bargain was then made, the old man was once a carpenter. Peter said he did not understand it. Peter and I and the old man talked of it. The old man said Peter and I should consider about it. I came again, and Peter and I made a bargain, and I finished the house. Peter paid me about sixty five pounds, not sure as to the exact sum. Some extra, five dollars to put an arch over the front door. I made a board and *John Stoner* painted the name of Peter and his wife on it, I have seen it since. The size of the house is forty feet by thirty-two. I cannot tell where the lumber was got. I went with Peter to Dr. *Frener's* to buy paint and oil. Peter bought every thing we used, we had nothing to do with the old man. The old man was often there. I cannot tell that he bought any materials. The house was built the same spring they began the canal.

*Joseph Bricker.* *Lose* and I built the house. We did not make a bargain the first time we took it into consideration. Peter said he did not understand much about buildings, the old man was pres-

(Eckert & others *v.* Eckert & others.)

ent the first time.  *Lose* made the bargain, and he and I built the house together.  I think we got about sixty-five pounds for our work and five dollars extra for the arched door.  Peter paid us our money.  The house is forty feet by more than thirty.  I think we built the house in eighteen hundred and twenty two.  I know from the board in the wall.  The board states that the house was built by *Peter Eckert* and *Anna Maria* his wife in eighteen hundred and twenty two.  Peter bought all the materials, and brought them as we wanted them.  Peter built a bake oven and a house over it, and a smoke house, of stone.  I did the Carpenter's work of these houses.  He built a granary in the barn before the house was built.  I did the work.  This was the first year Peter moved on this place.  The old man nearly joined places with Peter—they lived in sight of each other.  After the house was built I was at work in Peter's barn.  The old man came and told me, that Peter had offered him money on the land.  He would not take it.  The old man told Peter to put out the money himself.  He had money out himself, and was afraid he would lose some of his own money, Peter was younger and more able to take care of it or look after it.  Peter told his father he did not know what would happen, how matters would go about this land.  That he had built on the land, and it might be taken from him.  The old man said it was made in such a way that no person could take it from him.  This was not long after he offered the money to his father.  He offered the money in the spring, and this conversation was before harvest.  The old man told me, Peter had nothing to pay for his land till after his, the old man's death, and repeated the former reasons for not taking the money, and that Peter was to pay nothing till after his death.  Peter said take the money and give it to your daughters, they have more need of it than I have.  The old man said no let them see how they will come through the world—they had more than he had when he began house keeping.  The old man did not mention the sum Peter offered to him.  The old man said nothing about what Peter was to give, or to pay for the land during his, the old man's life.  He did not say Peter was to pay rent, and take the price of the buildings out of it.  Peter paid for the buildings, as much as witness knew.  The old man told me when the masons were done they wanted the money, or a note with interest.  That Peter told him so, and he told Peter to borrow the money, that he had some which he would give him, but not quite enough, then he went to his sister, Widow Brandt, and from her got what the old man could not raise, and paid the masons, then Peter got money from the Turnpike and paid the money borrowed from the old man, and widow Brandt.  I was there while Peter was lying dead.  The old man came to me on the porch.  He was crying.  He said now his best

friend in the world was dead, yet he was glad that Peter and him had settled all their affairs; that Peter owed him nothing and he owed Peter nothing—it pleased him that they had settled it themselves, and he, the old man, had not to settle with others. The old man told me nothing of how Peter was to have it during his life, nor what he was to give for it. When the old man got any grain from Peter he always paid him for it. The old man told me that he paid Peter for every thing as if he were a stranger. I prepared locust posts, and *Imhoff* the rails and made fence. I was two days preparing the posts. I do not know how much fence. Peter paid me for my work. I was there eight or ten years ago. I cannot tell the value of the improvements.

*John Zuch.*—I am not much acquainted with the family—but some time after Peter's death, *Jacob* and *George Mase* came to my barn and spoke to me if I would not go along to old *Philip Eckert's* house; they said they had something to speak with him, and wanted some body along. I went with them to old *Philip Eckert's;* they had a good deal of conversation; and the Mases asked about the affairs between Philip's and Peter's estate; they asked if he had any claim on Peter's estate, he answered he had no demand. Peter does not owe me any thing. He said he had made a will in his, Peter's life time, and in that will he had given this land to Peter at twenty-five hundred pounds, but if Peter does not get out of the Canal company five hundred pounds, then Peter shall have it for two thousand pounds. I am not so positive but I think the old man said Peter had offered him money. The old man would not take it, saying he had a good deal of money out already, and was afraid some of it would be lost. This he gave as a reason why he did not take the money. This meeting was after Peter's death, the next winter, in January. The old man said as soon as the masons did the mason work they came for their money, and Peter had it not; they asked a note with interest; the old man said to Peter that he should not give his note. He had some money, he would give him some, and he took it. He said he lent it, and Peter paid it back. The Mases were there before I got to the house, they said they would like to know if Peter's children would be the heirs to that land; they perhaps told me to remember. Q. Did the Mases tell him to take care what he said, they had a witness? No. They appeared as friends. I may have been taken as a witness I cannot remember. I went as a neighbor, we were good neighbors. After we left Eckert's they told me to remember the words spoken in German, to remember that Peter's children should be the heirs of what Peter was to get out of his estate. I do not remember that they said they had been to a lawyer; they may have said so, but I do not now know any thing about it. I do not recollect any thing

(Eckert & others, *v.* Eckert and others,)

about rent, or his giving Peter a receipt for the rent, or who got the rent, while Peter was on the place.   I do not know of any receipt for the rent.

*Adam Stager.*—When I built my barn *Philip Eckert* came to me for stones.   Philip said he would have to pay Peter for them as well as me.   I asked why.   Philip answered he had given Peter the plantation out and out.   He must pay for them there as well as any place else.   I cannot say what year this was exactly; it was about eight years ago.   I lived two or three hundred yards from him.   I gave him stone as a present; I cannot tell for what he wanted them, and I cannot tell when Peter's house was built, whether before or after my barn.   I do not know how many stones.   He picked them up on the fields.

*The Deposition of William Lutz.*—Philip Eckert told deponent more than once, that he had given the plantation upon which his son Peter resided, in Lebanon county, to the said Peter.   I lived a near neighbor to Philip, and Peter Eckert and knew them well.   I went to Philip Eckert's house, with *Peter Daub* his son-in-law, after Peter's death.   Philip Eckert asked *Peter Daub* if he had got the place from the Maces.   Yes, he said, he could have it if he would rent it from them.   Philip Eckert said yes, if they only had the plantation it would be well.   I was present when the guardians of *Peter Eckert's* minor children and the Maces were trying to compromise the matter.   The guardians offered to give, up the plantation if *Philip Eckert* would give writings to give Peter's children an equal share with his other children.   Philip said he would not cut them out, but refused to give writings; they could not settle.   I have heard *Philip Eckert* say that he had given, *anjaslagen,* the said plantation to his son Peter for twenty-five hundred pounds, and if Peter did not recover five hundred pounds from the Union Canal Company for damages, that his Philip's estate, should make it good to Peter.   *George Eckert,* the brother of Peter, got between two and three hundred acres of land from his father Philip.   Philip had only two sons.   I also heard Philip advise his son Peter to sell a part of the said land.   I also heard *Philip Eckert* say that his son Peter was nothing in his debt until after his death, then said Peter should pay the said Philip's estate, twenty-five hundred pounds.   I also heard *Philip Eckert* make the widow of Peter an offer, if she would give the plantation to him, he the said Philip would give her three hundred dollars, and in case he could settle with the guardians of Peter's minor children, he would give her five hundred dollars.   The transaction of which *Philip Eckert* told me, was on the second day of March, eighteen hundred and twenty-six.

*John Hoffman.*—I know nothing about a contract for this land. I had no conversation with Philip about one.   Old Mr. *Eckert*

43

and *Lesher* and I, contracted with the Canal Company about dama-ges. We joined in getting a survey. *Mifflin* told us to get *Hol-lingsworth* to survey the land damaged by the canal, and we did so. The old man told me if Peter did not get five hundred pounds from the Canal Company, his estate must give five hundred pounds, as he had given him the land. He did not mention how he had given it. We never spoke about it afterwards. This was about two years after they had finished digging the canal. I am one of the administrators of Peter's estate, *John Mace* is the other. I saw no receipt from Philip to Peter for rent, and know of none; I gave all the papers to the appraisers. There was a due bill from the Turnpike Company. The company were indebted to Peter. I think *Mace* got the money for it. I never received it. It was brought into our administration.

*Michael Spang.*—I was at *Henry Tice's* and old Mr. *Eckert* came there and said he had great trouble, he said he wanted advice from Mr. *Tice*, who was sick and could not give him advice. I asked what his trouble was and then he told me about this planta-tion, that he had made a will and willed it to his son Peter for twenty-five hundred pounds, that if Peter did not get five hun-dred pounds from the Canal Company it must come out of his estate after his death. I said you had best settle with them, that was the best advice I could give. He said they were on the place, the guardians and him, for the purpose of settling, and he made an offer to the guardians to give Peter's children a share of his estate, as much as one of the others: not as much as George. The guardi-ans asked how much George had, and how much one of the girl's or child's share was; George came and said if they want to know that, or weigh you while you are living do not settle at all, and then they parted. I know the land thirty years. George lived on it. He married twenty-four years ago, and went on it, lived on it twelve or thirteen years, and moved to the old place. Peter mov-ed to the land in dispute when George went on the Mansion place. I cannot say the year. The old man lived with George several years on the old place. The land in dispute is rented at four or five hundred dollars. It is two miles from town on the road; it was worth as much when Peter lived there as now. Peter had it in as good order as now. George built a spring house of stone and a large log stable on it. I cannot say as to the wagon shed and corn cribs. The land was worth more then than it is now, but rents are not so high.

*Jacob Swope.*—I live adjoining this place. I think Peter came there in eighteen hundred and twenty. I know the house Peter built on the land, and a smoke house, and a granary in the barn. He built in a year or two after he came into possession. I think the value of the improvements he made would be two thous-

(Eckert & others *v.* Eckert & others.)

and dollars. I would hardly do it for that. He worked and managed the land as his own. His father lived in sight while he was building. I never heard the old man say how he had given it to Peter.

*Adam Stager, Michael Spang,* and *Joseph Bricker,* testified that the improvements made on the land by Peter were worth two thousand dollars.

*John Bucher.*—I was collector of tax in eighteen hundred and twenty-three. I received from Peter twelve dollars and forty cents, and ten dollars and one cent, this was for eighteen hundred and twenty-two. I was Assessor. I forgot what old Philip returned. Peter returned this land himself. Philip returned what he lived on, and no more. The old man said the canal spoiled a good deal of Peter's land. "It spoiled much land of my Peter, or for my Peter."

*Peter Smith.*—I was Collector in eighteen hundred and twenty four and eighteen hundred and twenty-five. Peter's tax was ten dollars and seven dollars and fifty cents: he or his administrators paid it. This place was assessed in his name. I did not call on Philip but for the tax where he lived.

*George Miley.*—In eighteen hundred and twenty I took the assessment for my father. *Peter Eckert* gave in his assessment of this place. I cannot say whether he or George gave it in. Peter was assessed for this tract and George for his own.

Dr. *Benjamin Frener.*—Peter bought white lead, &c. for his house. I cannot tell the amount he paid for it. After the house was built the old man and I talked about building it. I said Peter was particular, he wanted venitian blinds. He said Peter was able enough and had money.

*Jacob Nagle.*—*Peter Eckert* when he was building his new house, got a lightning rod from me for it, and he paid me for it.

*George W. Kline,* Esq.—After Peter's death, and before the old man's death, the administrators or one of them, *John Mase,* and the three guardians, and *Philip Eckert* met in my office. The object was to compromise the difficulty as to this farm, which arose after Peter's death, and which it was alleged had been given to Peter. The guardians alleged it was absolutely the property of Peter's children, and this was denied by Philip. He denied that he had given it absolutely to Peter. Philip stated there had been an understanding between him and Peter, that Peter was to have this farm, but he had never given him any writing for it. If Peter had lived, there would have been no difficulty about it. He considered he had a right to dispose of it as he pleased, never having given him any transfer of it. Philip persisted he had transferred only by words; there was an understanding that Peter was to have

it, and if Peter had lived there would have been no difficulty, but he sidered he had the right to do with it as he pleased.    Terms of compromise were not carried into effect.    No papers of any kind were produced at that time.    None submitted to me on either side.  Peter died, August eighteen hundred and twenty-five.  This may have been . six months after, more, or less.    Question.    Did not you see a paper in the hand writing of *L. G. Hollingsworth*, a ' settlement of rent made by Philip and Peter . a short time before Peter's death, and whether he did not give it to *J. Mace*, and whether it was not part of the matter talked of before him?  Answer.  I never saw this or any other paper until after I was employed as counsel in the suit brought.  Their papers were given to me by my clients. I positively say no paper was produced or mentioned that day in my office. I have not been counsel since the last circuit court. I have not seen this paper since.

*Adam Stager.*—I think *Peter Eckert* was between thirty-five and thirty-six years of age when he died.

*The Defendants gave in evidence*

A deed, *George Buehler* and wife to *Philip Eckert*, dated in eighteen hundred and two, for one hundred and sixty-seven acres in consideration of two thousand five hundred and two pounds, acknowledged in eighteen hundred and two, and recorded same year in *Dauphin* county. Patent, twenty-six August, seventeen hundred and sixty to *Abraham Weidman* for same land.    The will of *Philip Eckert*, dated twentieth July, eighteen hundred and twenty-seven, roved twenty-ninth November, eighteen hundred and twenty-eight, was offered in evidence by the defendants, objected to by the plaintiffs and admitted by the court, and the point noted by the court.    Codicil, thirteenth of May, eighteen hundred and twenty-eight, was given in evidence with the will.

Defendants offered to prove that Peter lived on the lower plantation till eighteen hundred and twenty, and got from his father all his farming utensils, stock, &c. that George lived here before, and built and paid for what he built.    The evidence was objected to by the plaintiffs and the court admitted the evidence and noted the point.

*George Beckly.*—For two years I lived a mile from old Mr. *Eckert* while he lived on the lower place.    I cannot tell the year Peter moved; it was in the Spring.  Peter took along all the things the old man had on the farm, five horses, one colt, two wagons, all the cattle on the place, and two ploughs and two harrows. · I do not know how many cattle.    The old man took two cows and one horse. He drove the sheep along and the hogs.  I cannot tell on what terms Peter had this place, whether on rent or to be sold to him.    He lived there four or five years.  I do not know how much a year the place was worth.  George built a horse stable for his horses, I cannot recollect any more.  Peter worked on the lower farm

(Eckert & others *v.* Eckert & others.)

for his father, I do not know, if he had the place or not. I cannot tell if Peter was married a year, or a year and a half before he moved. Peter had always lived with his father. I believe he farmed and managed the old place about eighteen hundred and twenty when he married. I and the old man were at Peter's and saw the stock. The old man lived with George about two years, George built a house there for the old man. I did not count the cows or sheep. I saw them and Peter told me he brought them with him. The stock on the old place belonged all to the old man. Peter had none, Peter himself told me he had none. I did not know George's stock when he moved. I had a talk with Peter about the house, I came to his new house, and I said you have a fine house, he said yes, if I had it all paid for; I said you can pay that, he said if my father would give me the money. He did promise to give me the money to pay the hands off. Peter said his father gave him the money, almost all, to pay for the house.

This was the same year he built his house, I cannot tell the year, it was in the fall, at his own house. I never told this before, I had no conversation since I left the court. I forgot it entirely this morning. It came into my head all at once. George asked me if I had said all, I told him no; and told him what I now say; this was in the court house, I never had any conversation before with George about what I was to swear. I went to Peter as a friend, when we had this conversation. George's mother and myself are cousins; I never told this from that time till to day. I know no more.

*Michael Seltzer.*—In eighteen hundred and twenty-one, old Mr. *Eckert* came to *Jonestown* for some lumber. He wanted joice, rafters, scantling and boards; I had none of the first that suited—but he picked four thousand feet of boards. Peter got and paid for them. The old man said Peter would come and pay for them. I told the old man to bring a bill for scantling, and I would get it. Peter brought that bill and the next Spring I got joice, rafters and scantling. That was in April or May eighteen hundred and twenty-two. The whole came to better than sixty pounds. Peter paid for all. The old gentlemen told me it was for a house for his son Peter.

*John Wyne.*—I built a stable on the place for George; George paid me for it. I cannot tell what year George lived there; I also built a wagon shed and corn crib.

*John Heffleflinger.*—*Sloner* made a contract for himself and me at *Eckert's* for twenty-three pounds for tending masons. We began and finished the building and plastering. I burnt a lime-kiln which came to six dollars. Sometimes the old man was there, and assisting at getting stone for the lime kiln. This was before the house was built; *Peter Eckert* paid me twenty-five pounds, five shillings.

(Eckert & others *v.* Eckert & others.)

*Conrad Daub.*—I built a spring house for George, *Weirick* helped me, it was of stone.   I agreed with George and he paid me twenty or twenty-two dollars.

Defendants offered to prove by *Lydia Eckert,* widow of Philip, a settlement between the old man and Peter.   Mr. *Norris* requires the offer to be reduced to writing.   The court refused to require it, and the point was noted by the Judge.

*Witness.*—Peter farmed the old place one year before he moved up.   It is more than I can tell just how he was to go.   Peter got all his father had farming with, horses and gears, wagon, ploughs and young creatures and what he had on the farm——The father made no vendue; he got five horses, all he had but one he kept for himself, and a good many cows and young cattle. I cannot tell more—I cannot tell how many sheep, but three or four he kept, so of the hogs, two ploughs, I do not know about the harrows, bags, and bagging not made up.   Peter sold the grain he raised the year before he moved.   Peter came once there, he did not live long after he came there, and said he had money he wanted to pay on the place rather than put it out.   I told the old man, and he would not take it.   I saw *Hollingsworth* write the receipt for the rent, I never heard Peter say any thing about it, I only know what the old man told, and it is not in the chest.

Articles of Agreement between *Philip Eckert,* and *George Eckert,* dated twenty-third December, eighteen hundred and nineteen.

Deed from same to same, dated fourteenth January, eighteen hundred and twenty, for two hundred and thirty-eight acres, consideration three thousand pounds——one thousand pounds in hand, and two hundred pounds a year. *Witness*——George built a house. I was along when George paid the one thousand pounds.   It was paid at *Goodharts,* in town.   I cannot tell the year Peter married; nor how many years he was married. He worked for his father as long as he was single.   We lived with George on the old place a year.

*Jacob Swope.*——George built a frame piece to the barn, a stone spring house, a stable for his horses of logs, a wagon shed and corn crib together, and a hog stable.   The rent for that place was four hundred dollars a year.  The rent was not so high when George lived there, but the grain was higher.   There are forty acres of woodland, or above thirty on the land in dispute.   George lived about ten years on this place.  The tract contains one hundred and forty acres.  The tract of land is good.

*The plaintiff then gave evidence.*

*Frederick Stoner.*   I am a mason.   Old Mr. *Eckert* was there at Peter's when the cellar wall was built.   It was six feet the old man wanted it.   My father said he would not do it unless he would pay extra.   Old Philip went away and said no more, and

we made it no higher.  Just as we were finishing the work, the old man was there, and he said Peter had not the money to pay us. My father said he might give a note for it, and the old man went away and said nothing.    When we were done with the work Peter paid us the money---the old man was not there.

*George Shott.*   I was collector in 1818 & '19.  I called on George on the land in dispute, and he paid me the taxes for 1818-- nineteen dollars and eighty-one cents.

### *Evidence for defendants.*

*Jacob Stouch.*   The land in dispute rents for four hundred and twenty dollars this year---last year for $433.

*George W. Kline.*  I was counsel between these parties in May, 1829.   Christian was then examined and sworn in the usual manner.   So was *Joseph Bricker* and *George Lose*, and *John Bucher* and *Peter Smith*, and *George Miley.*   I am not certain as to *E- manuel.   John Zuch* and *Wm. Leitz*, were all examined.

The record of the former trial and verdict of the jury were given in evidence.

### *Evidence for the plaintiffs:*

*Adam Stager.*   I have known *George* and *Peter Eckert*, more than thirty years.   George took a good stock from this place--- four, five or six horses.   Here the court said this is wasting time. The Court refused to examine witnesses as to what would be the wages of Peter for nine or ten years after he came of age.   The plaintiffs' counsel objected to this opinion, and the point was noted by the court.

The following paper was offered by the plaintiffs:

| | |
|---|---|
| *Margaret Eckert*, by her guardian *Jacob Mase*, jr. *Polly Eckert*, by her guardian, *Michael Garman* and *Louisa Eckert*, by her guardian *George Mase*. | In the circuit court of *Lebanon* county, of March Term, 1830, |
| *vs.* | |
| *George Eckert*, *George Boyer* and *Samuel Fisher*. | No. 1. Ejectment. |

We the guardians above named, do hereby consent, and for our wards, the plaintiffs, do hereby agree, that if the Jury now trying the above cause, shall find a verdict for the plaintiff, that the final judgment rendered upon the verdict, shall be with a stay of execution thereon, until the first day of July next, and that in the interval, the executors of *Philip Eckert* shall settle and liquidate the share of *Peter Eckert*, out of his father *Philip Eckert's* estate, under the last will of the said Philip, and if such share shall not a-

(Eckert & others *v.* Eckert & others.)

mount to the sum at which the land and premises were put to *Peter Eckert*, by his father, that then in that case, the said guardians shall before the first day of July next, pay to the executors of *Philip Eckert*, the balance of the purchase money of the said land, and that if the executors shall not settle and liquidate the claims of *Peter Eckart*, under the will of his father, and receive from the guardians the balance due for the land given to Peter if any such balance shall be found to be due, that then in that case execution shall issue upon the judgment, on the first day of July next, and the plaintiff be put in possession of the land and premises.

Given under our hands and seals, this 16th day of March, A. D. 1832.

JACOB MASE Jr. [SEAL.]
GEORGE MASE, [SEAL.]
GEORGE FISHER, } [SEAL.]
WM. NORRIS, }

Attorneys for the plaintiff and all the guardians.

---

HEADS OF THE CHARGE OF THE COURT.

Much is to be laid out of view, taxes, assessments, of George, and Peter, the personal estate, and the house, in part at least, and whether plaintiffs, will get more or less by the will.

The questions are

1. Did the old man give the land to Peter?

2. Did he agree to sell it to him?

3. Did he at one time make a will by which he devised it to Peter, and did he always allude to this when he spoke of this land and Peter?

The court read all the evidence of a gift, principally *C. Bricker's* and that of *Bucher*, *Stager* and *Hoffman*. As to the sale I can find no evidence of it. Improvements, without an agreement to sell is nothing. As to buildings, as evidence of a gift or sale they are equivocal, and must be after the agreement. Were they in consequence of personal property and use of land, or as his own? There was a settlement. *Bricker* proves it. About what did they settle; not for the the land, for the old man refused to take money for that, and said that nothing would be due till after his death for that. This settlement is not produced. Notice was given to produce it. If you believe that plaintiffs have it, (and they were called on, and refused to swear they have it not,) and they do not produce it, you may take it, that if produced it would prove against them. If you believe they have it not, lay it out of the question. As to the possession, he was put on as a son, left there as a son, to whom it was willed—as to the

will, the court read all the evidence on the subject.    This is a most important matter as to its general influence.    It tends to prevent a man from acts of kindness to his children; to set children in opposition to their parents; to introduce perjury; to make a man give to one child what he never intended, and rob the rest of his children without his knowledge, and against his will.

When you have made a will you say you have given your place to your son; but you do not tell how much he is to pay to his brothers and sisters, and he proves your expressions, and takes it for nothing.    There is no contract or promise made to Peter.    No body ever heard the old man and Peter ever speak together about it. All is talk and loose talk with hirelings at their work, or strangers by accident.    Not one old farmer neighbor ever heard of it.    Philip's wife never heard how Peter was there.    No man can tell what, when or where this bargain was made.    If the old man gave it for nothing—or if he agreed to sell and convey, and Peter has paid for it—if it ever was intended, or understood that the old man was to give a deed, it is one thing and the cases read apply.    I can find no evidence of such agreement—if you can you will do so.    If it was only a promise to make a will, or a statement that he had made one, the cases have no bearing, for a promise to make a will is not a will, and cannot carry land.    If he made a will he could change it. The law is so—it must be so, and the plaintiffs have no pretence to this land.

You can all make wills and change them when you please—if not it were better to deprive you of the power at once.

As to the tender, this land was taken from the plaintiffs by a decision of the court.    It is not the law, that if a purchaser is evicted for non payment of money, that he can recover without tendering the money due.    If then there was a contract to sell, the plaintiffs cannot recover until they tender the money due and bring it into court.    If there be a parole contract, there can be no recovery without a tender, and if a will was promised, I have said that this will would not enable the plaintiffs to recover.

The only ground of recovery is that it was a gift or a sale, and all the money paid.    I have said I see no evidence of either, and without you find that it was a gift to Peter for nothing; or unless you disbelieve all the evidence about Peter having to pay twenty-five hundred pounds, the plaintiffs cannot recover, and your verdict should be for the defendants.

The gentlemen admit it was no gift.    We do not want execution, said Mr. *Norris*, until we pay the twenty-five hundred pounds and the guardians can raise or borrow the money.    The paper filed does not alter the case.    Instead of settling a cause it is calculated to raise as many disputes and law suitsas will waste one or two

(Eckert & others *v.* Eckert & others.)

shares of this estate. But it makes an end of all claim as a gift. You may, however, find it was a gift, if there is evidence of it. If there is no evidence, you cannot say there was a gift.

The plaintiffs filed the following reasons for an appeal:

1. That the court erred in admitting in evidence the will of *Philip Eckert*, deceased.

2. The court erred in admitting the evidence of *George Beckly*, respecting the stock and farming utensils which Peter received from his father in the spring of eighteen hundred and twenty, when he moved on the land in dispute.

3. That the court erred in admitting in evidence any acts of *Philip Eckert*, after the summer of eighteen hundred and twenty-two, tending to prove that the land in dispute was his and not his son's.

4. That the court erred in refusing to require the defendants to reduce to writing the testimony they proposed to give by the witness *Lydia Eckert*, the widow of *Philip Eckert*, and the mother of Peter the son.

5. The court erred in refusing to admit the evidence of *Adam Stager*, tending to prove that Peter worked for his father many years after he became of age, and the evidence of the value of his wages for each year—the court erred in rejecting this evidence because it was to repel the evidence of the defendants, tending. to prove that the father had in the spring of eighteen hundred and twenty, given Peter all his stock, farming utensils, &c.

6. That the court erred in their charge to the jury, in all the matters of law arising from the testimony in the cause.

7. That the court erred in charging the jury that there was no evidence of a gift by Philip to his son of the land in dispute, and if there was the proposition filed on the trial by the guardians of the plaintiffs, entirely destroys all claim of right to the land on the part of the plaintiffs.

8. That the court erred in charging the jury, that it might be found that the improvements made by Peter on the land were paid for out of the rents of the land when there was not a spark of evidence that Peter was ever considered by his father as a tenant in any manner whatsoever: and this was told to the jury when there was the positive evidence of more than three witnesses that the father had given Peter the land; and that he had given it to him out and out, when there was the positive evidence that Peter had expended his own money and labor in building and improving the farm, and not a human being had said that the buildings and improvements were to be paid for out of the rents and profits of the land.

9. That the court erred in charging the jury that the father always said he intended to give the land to Peter by his will, and to give it in no other way: when there was the express and positive

(Eckert & others *v.* Eckert & others.)

evidence of *Chritian Bricker, Adam Stager,* and other witnesses that *Philip Eckert* had at various times, and not in the roads, said in the most solemn manner, he had given the land to his son Peter, that he had made it so that no man could take it from him, that he had put it to Peter at twenty-five hundred pounds.   Peter to be allowed five hundred pounds out of this sum if he did not get five hundred pounds from the Union Canal Company for damages done to Peter's land.

10. That the court erred in charging the jury that if a father puts a son on a tract of land telling him that he will give it to him by his will, and in consequence of his gift and delivery of possession, the son makes valuable improvements on the faith of this gift and delivery of possession, that this gift and possession and improvement give to the son no title to the land by the laws of Pennsylvania.

11. That the court erred in charging the jury, that a delivery of possession of land to a son, the father saying that he will give it to him by will, give no title to the son to continue on the land; and on the faith of the father's promise, if he erect valuable improvements, continuing on the land as the owner of it, paying the taxes and exercising all acts of ownership, gives the son no title to the land, and that after the death of the son, the father may by a new will give the land away from the widow and children of the son.

12. That the court erred in charging the jury that there was no evidence of a sale of the land by Philip to his son Peter, because there is no witness who testifies that the words "bargain, sale or contract," were ever used by the father and son in relation to the land, when there is express evidence that the father did say that his son Peter was to have the land at twenty-five hundred or two thousand pounds, and this sum to be paid at the father's death.

13. That the court erred in charging the jury, that the evidence of the gift, and of the sale and of the possession of the land, delivered to Peter, and the improvements made by him on the land, by expending his money and labour, were not in law any bar to his father's making a new will, and his giving the land away from the widow and children of Peter the son.

14. That the court erred in charging the jury, that the plaintiffs could not recover in this suit without taking away from *Philip Eckert,* the right of every freeman, (so valuable,) to make his will, and dispose of his estate at his will and pleasure.

15. That the court erred, in charging the jury, that the paper filed did not alter the case, that instead of settling a cause, *it is calculated to raise as many disputes and law suits as will waste one or two shares of this estate, this part of the charge being totally without any evidence to support it—for the evidence necessary to ef-

fect a settlement of *Philip Eckert's* estate, was not and could not be before the court in the trial of this cause.

16. That the charge of the court to the jury upon the testimony and facts in the cause was in a way to take the decision of the facts from the jury.

17. That the court charged the jury that a certain receipt in the possession of the plaintiffs, and not produced by them was against them, when the plaintiffs were the guardians, and *ohn Mace* one of the Administrators of *Peter Eckert*, deceased, was in the court and not examined touching the said receipt: the receipt it was alleged was given by *Philip Eckert* to his son Peter in the life time of both.

18. That the court erred in charging the jury, that much of the evidence in the cause was to be laid out of view. Such as taxes, assessments, of George and Peter, personal estate, &c. or whether the plaintiffs will get more or less by the will, &c. as it is believed that in all contracts for the sale of property, by parol, all the circumstances in evidence must be taken together, to enable a jury to infer from them a contract, and this particularly, when the transaction is between father and son.

19. The judge told the jury as to a sale he could find no evidence of it. In this it is believed there is error, as the word *angeschlagen* in the German language, imports a contract. They should therefore have been told that if it had this import they might infer a contract from it, and all the other facts and circumstances in evidence in the cause.

20. In speaking of the improvements made by the son, the court leaves it to the jury to infer, that they were made out of the personal property given by the father to the son: such as horses and other stock, wagons, ploughs, harrows, &c. *Prout* the testimony, and out of the rents of the land or use of it. In this it is believed the judge erred, as there was no evidence that the stock was given for that purpose—nor could it be out of the rents, as the proof was that the stone house and other buildings in evidence, were commenced and completed in the spring of eighteen hundred and twenty-two, two years after Peter went into possession.

21. The judge told the jury, there is no contract or promise made to Peter. No body ever heard the old man and Peter ever speak together about it. All is talk and loose talk with hirelings at their work, or strangers by accident. Not one old farmer neighbor ever heard of it. His wife never heard how Peter was there. No man can tell what or when or where this bargain was made. In this it is believed there is error; for if a contract can be inferred from the conduct of both parties, and from the acts of the vendee, such as building expensive houses, &c. &c. which would not otherwise have been erected, &c. otherwise than in pursuance of the con-

(Eckert & others *v.* Eckert & others.)

tract, all the facts and circumstances in the evidence ought to have been submitted to the jury, with directions that from them they might infer a contract, particularly so, as the terms of the contract were fixed by the old man, both as to the price and time of payment, by all his respectable old neighbors and farmers who immediately join his land.

22. That from all the facts and acts done of both the contracting parties as given in evidence, the jury ought to have been informed that the verdict should be for the plaintiffs.

23. That the verdict of the jury is contrary to the evidence in the cause and against the law of the case. There ought, therefore, to be a new trial.

*Norris* and *Fisher* for the appellant, reviewed the evidence, and contended that this case could not be distinguished from *Syler* v. *Eckhart*, 1 *Bin.* 378. It was the case of a gift by a father to his son accompanied by possession, and valuable improvements.

There was no distinction between a gift by parol, and a sale by parol. The estate was given to Peter upon specific terms, and the father told his neighbours all around, that he had given the place to Peter. He spoke in the past tense and not in the future, of what he had done, not what he would do. Nor is there any distinction between a promise by a father to his son, to give him a tract of land by his will and possession taken, and improvements made upon it, on the faith of such a promise; and the case of a parol sale or gift, possession and improvements. In either case a title would be conferred, clear of the statute of frauds and perjuries. They took these positions.

1. That the evidence proved a gift or sale to Peter & George, respectively.

2. That after Peter was put in possession, by his father, and had made valuable improvements, the father was bound.

3. And that to take the land from Peter's wife, and children would be a fraud, and could not be sanctioned by the statute of frauds and perjuries.

Part performance takes the case out of the statute, because it would produce fraud to allow that the parol contract should not prevail, after such performance on the part of the grantee or vendee.

Such part performance, must be something done, as owner, which the party would not have done, except he considered himself as such, and which would not have been done but on account of an agreement making him the owner. 2 *Brown, Ch. Rep.* 561. 3 *Atkins,* 4. *Earl of Elsworth's case,* 2 *Strange,* 783. *Id.* 149. *Niven* v. *Belknap,* 2 *John. Rep.* 573. *Parkhurst* v. *Vancortland,* 14 *John. Rep.* 15, 31. *Ebert* v. *Wood,* 1 *Bin.* 216.

*Pre. in Chan.* 560. *Roberts on Frauds & Purjuries (New York edition,* 1807*)* 129, 131, 134, 135, 139, 140. *Syler* v. *Eckhart,*1 *Bin.* 378. They contended that the case of *Syler* v. *Eckhart,*in which a parol gift was established, was not so strong as the present case.

Possession taken is a strong circumstance to take a case out of the statute. *Jones* v. *Peterman,* 8 *Serg. & Rawle,* 543. *Renick* v. *Kern,* 14 *Serg. & Rawle,* 267. Here the evidence was of a gift of the entire estate, and irrevocable, and possession taken, and valuable improvements made on the faith of such gift. Philip sometimes named his will, but this was a mere form of expression, the substance was that he gave it to him "out and out." It would be to produce a fraud to permit the property now to be taken from his family.

They argued to shew that the court had withdrawn the facts from the jury; and that evidence of the will of Philip and of the personal property which Peter got from his father ought not to have been received in evidence. It was calculated to mislead the jury. The question was whether there was a gift or not, and no act of the grantor subsequent to the alleged gift and in conflict with it as his will was, should have been received. But after evidence had been received of the personal property which Peter got from his father, it was competent to repel its effect; by proving his services after he came of age.

The court were mistaken in charging the jury that the plaintiff should have tendered the amount which Peter was to pay on the land. If it were an advancement to Peter, he was not bound to pay until the estate of Philip was settled.

The court erred in charging the jury as to the non-production of an alleged receipt from Philip to Peter. Notice to produce such a paper had been served on the guardians, by whom the plaintiffs sued, but if such a paper existed, the administrator had the custody of it, and the defendants should have called them.

*Weidman* and *Elder* for the defendants in error. It is not denied that if a parol contract for the transfer of lands is made, and that contract is so far executed, that it would be inequitable that it should be set aside, such contract will prevail. But it must be a clear case, and clearly made out. 3 *Yeates,* 177.

So far from having made out a clear case, the counsel for the plaintiffs do not know whether to call it a gift, a sale, or advancement. There was no contract, but the case was simply of a father who had declared his intention to give the property to his son by his will, which certainly could not bind him.

The judge fairly submitted to the jury the question as to the existence of a gift or contract, and the jury have negatived all idea of any such thing. He expresses a strong opinion on this subject

to be sure, but this he had a right to do, and it is supported by the evidence.

The possession taken by Peter was not in pursuance of any contract, and was perfectly consistent with the relation of father and son which subsisted between him and Philip, independent of a contract, and was like that which his brother George had had of this same property, which it was not pretended could confer upon him any claim. When he did intend to part with a proportion of his estate, he made a deed for it to George.

To make improvements of any avail in taking a parol contract out of the statute, proof must be given that the contract was first made. It will not do to prove that the contract was made after the improvements. The improvements too were made out of the funds of the father. There was evidence that a settlement had taken place between them, and the receipt which was given upon that settlement was withheld.

If that receipt was evidence connected with the title to the land, the guardians were the persons in whose possession it should have been, and not the administrators.

The court were clearly right in receiving and rejecting the evidence noted.

The opinion of the court was delivered by

KENNEDY, J.—No less than twenty-three reasons numerically have been assigned and filed by the counsel for their appeal in this case from the decision of the Circuit Court, upon a motion for setting aside the verdict of the jury and granting a new trial. It is admitted by them, that the last six of these reasons are substantially contained in the preceding. The first six and the tenth and eleventh consist of exceptions to the opinion of the court given on questions of law in admitting and rejecting testimony; and in misdirecting the jury in the law of the case throughout. The remaining reasons are exceptions to the charge delivered by the court to the jury, in which it is alleged that the court misapprehended and misstated the evidence to them in many particulars; and that the charge upon the testimony and the facts to the jury, was given in such a way as to withdraw from them the decision of those matters.

It will be unnecessary to notice each of these exceptions to the charge of the court, because many of them are nothing more than a reiteration of the same things, but in a form some little variant. The objections, however, presented in them, have been fully considered by this court and will now be answered without referring numerically, to the reasons themselves as filed.

The first exception was to the admission of *Philip Echert's* will, which was most clearly relevant and available testimony for the defendants. It appeared from the evidence given by the

plaintiffs in the cause, that if their father *Peter Eckert*, who was dead and one of eight children of *Philip Eckert* the testator, had not become the owner of the land in dispute, either by gift or purchase from the testator in his lifetime, that the testator had died seised of it in fee : and it having also been proved upon their part, that they were among the number of the testator's heirs at law, they, as such, would have been entitled to a verdict for an undivided eighth part of the land, had not the will been given in evidence to shew that it had been otherwise disposed of by the proper owner.

The second exception was to the admission of the evidence of *George Beckley*, which went to shew that at the same time that *Peter Eckert* moved upon the land in dispute to reside, he got and took with him, almost all the stock and farming implements belonging to his father *Philip Echert*, consisting of horses harness for the same, wagons, cows, sheep, swine, ploughs, harrows, bags, bagging, &c.

To judge of the admissibility of this evidence, we must look at the testimony which had been given in the cause by the plaintiffs and the deductions which they claimed to draw from it. From their evidence it appeared that their father in the spring of 1820 had taken possession of the land; but under what arrangement did not appear from any direct testimony. The plaintiffs, however, claimed that it was either under a parol gift or contract for the purchase of it from his father *Philip Eckert*, and that the taking possession was such an execution of the contract in connection with the improvements made upon the land afterwards by their father, as took their case out of the statute against frauds and perjuries. Seeing then that no direct testimony was given by the plaintiffs of any previous agreement whatever, made between their father and his father, shewing the terms and conditions upon which he obtained the possession of the land, or indeed tending to shew any thing about it, I consider the testimony of *George Beckley* not only admissible, but that it was strongly relevant to repel the inference claimed to be raised by the plaintiffs of their father having obtained the lands from their grandfather, by a gift, if not by a contract for the purchase of it: for, without something like direct testimony, it ought not to be readily inferred that a father would make a gift to one child out of eight, to the exclusion of at least six of them, of almost all the property both real and moveable, which he at the time owned, without making any provision even for himself and his wife.

The third exception is that the court erred in admitting in evidence the acts of *Philip Eckert*, done after the summer of 1822, tending to prove that the land in dispute was his, and not his sons. The acts intended to be referred to in this exception are not mentioned or designated; and although I have examined all the

(Eckert and others *v.* Eckert and others.)

testimony given on behalf of the defendants, I cannot discover that any acts of *Philip Eckert*, were given in evidence, to which this exception can be applied.  I can readily imagine however many acts which might have been done even after 1822, by *Philip Eckert*, which would have tended to have shown that he was still the owner of the land, and which would have been both admissible and relevant.

There is nothing in the fourth exception.  Every one must perceive at the first glance, that it would be an idle waste and unnecessary consumption of time on the trial of a cause, if a party were obliged to stop and reduce first to writing every thing which he proposes or offers to prove or give evidence of, merely because his adversary choses to require it.  The reason for committing it to writing at any time is, that the purport of it may be fully and accurately understood and comprehended, in order to judge of its admissibility, and relevancy, of all which surely the court must judge, and exercise its own discretion.

The fifth is that the court refused to admit the testimony of *Adam Stager*, which was offered as rebutting evidence on the part of the plaintiffs, to shew that *Peter Eckert* had worked for his father many years after he attained full age, and what his services were worth per year; with a view to repel the effect of the evidence given by the defendants proving that *Peter* had got all his father's stock, implements of husbandry, &c.  In considering this exception it must be remembered that not a tittle of testimony had been, or was afterwards given in the cause, tending to shew that *Philip Eckert* had either made a gift or a sale of this property to *Peter*.  No witness produced could testify that *Philip* had at any time ever said so, or that he had given it to *Peter* for his labour and services, performed after he arrived at full age; nor did it appear that *Peter* had ever claimed the property in that way, nor in any other that I recollect of, as absolutely his own.  This evidence was then offered by the plaintiffs to prove absolute ownership of all this moveable property in *Peter*, without the least shadow of testimony going to shew a contract, or even an understanding between *Peter* and his father, that his father was to pay or satisfy him in any manner for his labour, or that he had made either a gift or a sale of it to him, upon any consideration.  It appears to me that this testimony under the circumstance of this case could not in the slightest degree conduce to prove ownership of this moveable property in *Peter*, and was therefore properly rejected.

The sixth exception is that the court erred in their charge to the jury in all the matters of law arising from the testimony in the cause.  This exception is quite too general in its terms to be admitted in practice.  But giving to the plaintiffs the full benefit of it and all that they can possibly claim under it, I do not discover

45

that the court has erred in charging the jury in any matters of law growing out of the testimony in the cause.

It may be, that in filing this sixth reason the matters contained in the tenth and eleventh reasons were in view, and intended to be brought forward under it; as they are the only remaining reasons which seem to embrace matters of law exclusively, and I shall therefore notice them now.

The tenth reason is that the court erred in charging the jury "that if a father puts a son on a tract of land, telling him that he will give it to him by his will, and in consequence of his gift and delivery of possession, the son makes valuable improvements, on the faith of this gift, and delivery of possession, that this gift and possession and improvements, give to the son no title to the land by the laws of Pennsylvania. I have searched the charge of the court throughout but in vain for the proposition which is made the basis of this exception. Nor does it appear to me that the testimony given in the cause was such as to make it necessary for the court to give its opinion to the jury upon the question involved in it. There was no part of the testimony which went to prove that *Philip Eckert* the father, put Peter his son upon the land, telling him at the same time that he would give it to him by his will. The farthest that the testimony on this point goes in favor of the plaintiffs is that the father some years after Peter was in possession of the land, and after he had made the improvments upon it, told some of the witnesses that he had "willed it to Peter," or "given it to him by his will." None of the witnesses professed, or undertook to say, that they had never heard the father and Peter even talk together, or heard either in the presence of the other speak on this subject. All that the court from its charge appears to have said to the jury on this part of the case was, that the circumstance of a son being in possession of land belonging to the father, to whom the father had devised it by his will, gave the son no title to the land during the life of the father. Nor after his death if the father before his death, should sell the land, or by a new will dispose of it otherwise to another, which he could and might do at his pleasure. Neither would it alter the case, although the father were heard to repeat fifty times or more, that he had given the land by his will to his son, his will during his life would still be revocable; or if the father had promised to make a will by which he would give a tract of land to his son who was in possession of it at the time, it would not pass or carry the land to the son. In this it does not appear to me that there was any error.

The eleventh exception is the same in substance with the tenth, and therefore already answered. It may however be well enough to observe, that the question raised in these two last exceptions is predicated on a statement of facts assumed without any proof

(Eckert & others *v.* Eckert & others.)

given to establish them; and for this reason the court would not have been bound to have charged in regard to it, even if the counsel of the plaintiffs had required it. The facts assumed were that the son had made valuable improvements upon the land, and paid the taxes assessed on it for a series of years, during the time he was in possession of it, upon the faith of the assurance of the father given to him, that he would will the land to him. Now it is only necessary to read the statement of the testimony given us in this case, in order to see that there is not an iota of evidence in it tending to prove that any such assurance was made by the father to the son, or that he ever told him that he would do so. The only evidence of an assurance made by *Philip Eckert* to his son Peter, of any kind, is in the testimony of *Joseph Bricker*, which was long after the possession had been taken and after all the improvements had been made; which will be noticed in the sequel.

I ought perhaps to have classed the thirteenth reason filed with those which relate to questions of law, rather than matters of fact; and therefore will observe upon it now.

It alleges "that the court erred in charging the jury that the evidence of the gift, and of the sale and the possession of the land delivered to Peter, and the improvements made by him on the land, by expending his money and labour, were not in law any bar to his father's making a new will, and his giving the land away from the widow and children of Peter the son." Considering all that is here imputed to the court, in the abstract, there does not appear to be any error in it, and if there be any thing wrong in it it must be in reference to the testimony which was given on this head. There is no evidence in the case which I can perceive of either a gift or sale by *Philip Eckert* to Peter, upon or at the time he got possession of the land, nor yet before he made the improvements upon it; and to this effect the court told the jury, or if there were, the court could not see it, but if the jury did they might act upon it. Without testimony being given then to shew a gift or sale of the land before the making of the improvements, I cannot conceive that a subsequent parol gift or sale of the land without a cent of money being shown to have been paid upon the purchase, could transfer any greater interest in it than an estate at will; which would be no bar to the father's giving or willing the land to whom he pleased afterwards, and taking it away from Peter's widow, and his children. To say that it would be otherwise, would not only be in direct contravention of the statute against frauds and perjuries, but in contradiction even to those decisions, which in some degree, have indirectly repealed it, by a mistaken exposition of it.

With respect to all the other reasons which remain unnoticed, and impute to the court a misapprehension, and incorrect statement of the testimony to the jury, it appears to me that the 'mis

apprehension and mis-statement, if there be any in the case, lie on the part of the counsel in stating and filing their reasons for this appeal. I do not however conceive it necessary to point out further the discrepancies between the charge of the court, and that which has been substituted for parts of it by the counsel in their reasons as filed; because I feel perfectly satisfied from a careful review of the whole of the testimony given on the part of the plaintiffs, in connexion with some of the evidence given on the side of the defendants, that the plaintiffs were not entitled to recover upon the most favorable construction that could rationally be given to their testimony. I will now turn to the testimony from which I think this can be made to appear very clear.

Philip the father was never heard to say that he had *conveyed* the land to his son Peter; nor that he had given it to him in any other way than by his will. It is true that some of the witnesses on behalf of the plaintiffs have testified to his having said that he had given it to him, without saying how; but others produced by the plaintiffs have testified that the father said he had willed the land to him, or gave it to him by will, and that he was to pay twenty-five hundred pounds for it to the father's estate after the father's death. Hence it appears to me that the only rational inference to be drawn from this testimony, taking it altogether, and admitting it to be true, is that the father, as often as he spoke of having given the land to his son Peter, must be considered as having an allusion to his will, and as saying nothing more than that he had given the land to Peter by his will; which if made known to Peter, he must be presumed to have known was revocable. There is not one of the witnesses who says that he ever heard the father and son talk together on this subject: and only one who says that he ever heard the father say that Peter and the father had even spoken together of it, and that but once. *Joseph Bricker* is this witness; who has testified, that he heard the father say at one time, but when he does not state precisely, though it must have been, from what he has said, sometime after the house was built, which was in 1822, "That Peter told his father that he did not know what would happen; how matters would go about this land. That he had built on the land, and it might be taken from him. The old man said it was made in such a way that no person could take it from him." From other parts of the testimony given on behalf of the plaintiffs it appears that George, the elder son of Philip, the father of Peter, had lived upon, and occupied the land in dispute during some eight or ten years, until near the time that Peter took possession of it; and that in that time George had built a stone spring house, and a large log stable upon it; and from the testimony of *John Wayne* and *Joseph Swope*, witnesses produced by

the defendants, that he had put up on this land, a frame addition to the barn, a corn-crib, wagon-shade and hog-stable.

It also appears from the testimony of the plaintiffs, that when George moved off from this land in the spring of 1820, that Peter went on it first to reside, and continued there until his death: but upon what terms or conditions does not appear.    And it would seem from that part of *Joseph Bricker's* testimony which has just been recited, that Peter did not consider himself as having any a-greement with his father by which he could hold the land: for he tells his father "he did not know what would happen, how matters would go about this land.    That he had built on the land, and it might be taken from him."    At this time, although after he had made the improvements, he does not make the slightest allu-sion to any gift or promise of his father, nor ask him to fulfil any contract that he had made with him in respect to this land; he does not even insinuate that any such had ever been made with him, or that his father had at any previous time given him any assurance that the land should be his, either upon, or without terms.    Had it been so, would he not at this time, when he felt un-easy about it, have reminded his father of it?    This part of the testimony so far from proving that the father had ever made Peter any previous gift, promise or engagement that the land should be his, proves the reverse, and that Peter at that time was only anxious to have something of the kind from his father.    It also goes to shew that Peter was not put into possession of the land in pursuance of either a gift or sale.    This necessarily leads us to the conclusion that Peter took possession of the land, and built the smoke-house, oven and dwelling house, without any gift or assurance from the father, that he would give him the land, and repels most forcibly the idea that the father had previously given it to him.    If so, Peter's taking possession of the land cannot be considered as having been done in execution of a gift of the land to him by his father, nor yet of a contrat for the purchase of it, so as to make what was done the execution of a parol contract, and by this means take the case out of the operation of the statute of frauds and perjuries: if then a gift or contract for the sale of the land were made, it must have been after *Peter* had taken, and while he was in possession of it and after he had made the improvements, which would leave the case fully within the statute against frauds and perjuries.    To this, however, it is ob-jected and argued that the erection of such valuable buildings as were made by Peter upon the land, within the short space of three years after he first took possession of it, is altogether incompati-ble, and cannot be reconciled with any other idea than that of own-ership by Peter, and that the jury in the absence of testimony to shew clearly the precise nature of the arrangement between Peter

(Eckert, & others *v.* Eckert & others.)

and his father, under which he took possession of the land, and made the improvements upon it, might and ought to have presumed a gift or sale of it to him by his father, and that the court ought to so have instructed the jury; and the more especially so, as the father stood by looking at Peter as he progressed with the improvements, not objecting to but approving of what he was doing.

Possibly there might be great weight in this argument if *Peter Eckert* and *Philip Eckert* had been strangers to each others, that is, not so closely related. But when we come to consider that they stood in the relation of father and son, and likewise to reflect upon the practice and understanding that generally prevail between a father and his children in this state, in respect to their living with him many years, sometimes after they have arrived at full age, without any agreement for compensation, indeed most frequently until they are married, if the father should happen to have a comfortable home for them, and he is in a situation to furnish them with employment. If he be the owner of lands, where his children may have separate dwellings after marriage, and sometimes before, they are placed, or permitted to go upon these lands, oftentimes without any agreement, to make all the profit they can out of them by occupation and use, and during such occupation to improve them either to promote their fortunes or to please their taste. This occurs frequently between fathers and their children without any agreement whatever for that purpose. It is done by the children in full confidence that they will sooner or later become the owners of such portions of their father's estate as will more than compensate them for all their labour and improvements. Is it not, I would ask a most reasonable expectation? for we have seldom seen those children disappointed of being rewarded to *the utmost extent* of their wishes, who have been most industrious and most zealous in improving their father's estate, and adding to his wealth; but who trusted entirely to parental affection and liberality for compensation The equity and justice of a father distributing his property equally, or according to their deserts among his children, at his death, is a sentiment that has long since pervaded the whole of this community. It was this that gave birth to our present statutes regulating descents and the distribution of intestate's estates. We also know from experience, and daily observation, that wherever a father does happen to depart from the rule of equality in distributing his property, that it is in favor, most commonly, of the child who has aided him most in acquiring, and adding to the value of it.

So that when we come to examine these matters and look at them as they take place, and are presented to our view, almost daily, between a father and his children, it appears to me that no such presumption as has been contended for, does, or ought

to arise.   And that a son's getting possession of a part, and perhaps the most valuable portion of his father's real estate, and making permanent and valuable improvements on it, without clear and satisfactory testimony to authorise it, is not to be referred to the son's having become the owner of the estate either by a gift, or sale from the father.   If it were to be held otherwise it would not only he repealing the statute against frauds and perjuries, but reversing the order of nature itself.   The rule laid down in the statute is that no agreement of the owner of land, although it should be made with a view to part with the fee-simple estate in it, unless reduced to writing, and signed by the party shall be sufficient to pass any greater interest therein than an estate at will.   If, however, we were to decide that the owner of land, by putting another into possession of it, who makes valuable improvements upon it, without either a verbal or written agreement for the sale of it to him, thereby loses all his right to the land; or in other words, thereby passes an estate in fee-simple, instead of one at will, would not only be laying down a rule overturning the one established by the statute, but inverting it; by making it necessary for the owner of land, as often as he permitted another to take the possession of it, in order to guard against losing it; to take a written agreement of the person so put into possession, that he will not make valuable improvements upon it, and thereby improve the owner out of his estate: This it is believed, would be so obviously repugnant to every rule of practice on this subject, and at the same time so novel in its nature, as to render any principle inadmissible which would make such a course necessary, in order to protect men in the enjoyment of their rights.

It would be most iniquitous, and unjust because it would go to deprive a man of his estate, without receiving an equivalent for it, against his will, and to give it to another, who had no reason to expect it.   And again would not the effect of it be, as between father and child, to reverse the law of nature, by depriving the parent of that authority and influence which the best interests of society, seem to require that he should ever maintain over his child.   The father with a view to encourage his son in a course of industry puts him in possession of a tract of land, and tells him to work it, and to make the most he can out of it, but at the same time wishing to keep a hold upon his son, so that his advice or admonition if requisite, may not be disregarded, he retains the title to the land in himself: and perhaps wisely as well as fortunately for both the son and himself, does he do so: for interest has too often a much stronger hold upon the minds of children, than either filial love, or a sense of filial duty.   How frequently do we see the father who has parted with all his estate to his children treated not only with neglect, and left to suffer for want of the ordinary necessaries and

(Eckert & others, *v.* Eckert and others.)

comforts of life, but in some instances avoided altogether, and even contemned, while on the other hand the parent, who retains his property, we see retains his authority over his children, and is cherished, or is at least apparently respected, and attended to by them throughout life. We ought therefore to be cautious, and ponder well before we sanction a principle, which might and doubtless would in many instances produce such results: among which would be to make beggars of parents for the purpose of rendering children not only wealthly, and independent, but disobedient and regardless of their parents, by giving and transferring to the children the property of the parents, against their consent, and without their ever having intended to part with their right to it. As it is impossible to foresee what time may bring about, parents may in the course of it have occasion to use their property for their own subsistence; or to reclaim it with a view to reform and control vicious children; or to make a more ample provision for one or more of their children, than was at first intended; which has been rendered indispensably necessary in consequence of some inevitable calamity, by which they have become totally unable to maintain themselves.

There is still, however, another view which may be taken of this case as it appeared in testimony, which precludes all idea of right on the part of the plaintiffs to recover the land in dispute. The annual value or rent of it at that time, according to the testimony of the plaintiff's own witnesses was equal to from four to five hundred dollars, more than sufficient with the other means put by the father into the hands of Peter to have met, and defrayed all the expenses, of making the improvements, as fast as they progressed. In the course of the third year, and not until then were they finished; now counting three years rent at twelve hundred dollars, which is the lowest estimate, Peter may be said to have been indebted to his father at the end of the third year in that sum, for the use of the farm alone, and bound, if required, to have paid it. There is no evidence, however, that the father ever did require, or that Peter ever paid it, unless it be considered, that as an equivalent for it, he had made the improvements upon the land for his father. And although the witnesses say that the improvements made by Peter were worth two thousand dollars, yet the amount of cash shewn to have been actually paid out by him for them, falls short of five hundred dollars. It must, however, be admitted, that in addition to this, a great deal of labor was performed in completing the buildings, in quarrying and hauling stone, and other materials for them, which was all done by Peter, which, if he did not pay money for, ought still to be counted as equal to it. But then it must also be recollected that his father furnished him with the means chiefly of doing all this, without any charge, that we hear of: for when Peter moved upon this land, his father

gave up almost every thing to him which he had upon his home farm. He got two wagons, a team of five horses, with harness for them, a considerable stock of cows, sheep, swine, ploughs, harrows and other implements of husbandry. The father had just before this sold and conveyed by deed his home farm to his eldest son George, for which George was to pay his father three thousand pounds, and he was about to move to a house upon a small lot of ground to live where he could neither maintain, nor have use for such things; and as he was about to place Peter on his other farm, that is the land in dispute, he sent every thing thither with him that he had no use for himself. Even the grain which was growing on the home farm at the time of the sale to George was reserved by the father, and given to Peter, which may fairly be presumed to have been equal in value to four or five hundred dollars, say at least one year's rent of the land in dispute; for the home farm is said to have been of more value than it. The farm in dispute was completely stocked, and provided by the father with every thing necessary for cultivating, and carrying on the business of the farm, and making the most of it, as well in the way of raising grain, as breeding of horses, cattle, &c. It may therefore be well supposed that the annual proceeds of the land in dispute, with the annual proceeds and advantages derived from every thing which Peter had upon it, furnished by the father, could not at the lowest estimate have been worth less than from seven to eight hundred dollars, which, at the close of the three years, would have amounted to upwards of twenty-one hundred dollars, which added to the value of the crop, gotten of the home farm, would have amounted to upwards of twenty-five hundred dollars, more than the highest value set upon the improvements made by Peter upon the land. Hence, in the absence of testimony to show any positive gift, or sale of the land to Peter, we might, and it appears to me ought to refer the making of all the improvements to an agreement between the parties, that was not necessary to be reduced to writing, and to be signed, in order to make it effectual and operative according to their intention. This agreement would be that Peter should have the use and occupation of the land, together with that of the other property delivered to him, for which he was to make the improvements upon the land for the father.

This view of the case shews that Peter could at no time have sustained an injury, even if the father had removed him from the land, for the profits and advantages received by him, appear at all times to have been in advance of his making the improvements, and that he must have been completely compensated, and greatly in arrear with his father at the time of his death, if a strict account had been taken. It also steers clear of all collision with the requisitions of the statute against frauds and perjuries.

(Eckert & others *v.* Eckert & others.)

I also take the rule of decision to be, that wherever the party claiming to have the land under a parol contract, made after he came into possession of .it, appears to have made improvements, and to have been fully compensated for them, that a specific execution of the contract will not be decreed. Nay, more, I believe that whenever adequate redress can be made by compensation in money, a conveyance of the land will not be decreed. For it is only in those cases where the possession has been taken, and given under a contract for the purchase, and where the injury done to the party complaining has been produced by the fraudulent conduct of the other party, and is at the same time of such extent as to admit of no redress, commensurate with the injury, short of a specific execution of the contract, that a conveyance of the land ought to be decreed; or in this state, where for want of a court of chancery, no conveyance can be decreed, that. the title to it ought to be considered as having passed under the parol contract, in the. same manner as if a deed of conveyance had been made. If this be not the principle upon which courts and juries ought to proceed, it is plain that the statute against frauds and perjuries will be violated without any necessity for it.

A number of cases have been cited by the counsel for the plaintiffs, and among the number the case of *Syler* and *Eckhart*, 1 *Bin.* 378, which is the only one of them all that bears resemblance to the present. The report of this case does not give the evidence, nor yet the particular circumstances of which evidence was given on the trial. There is some reason to believe however, that it was very different from the one now under consideration in several particulars, of so much importance as to make it a very different case. Some of the counsel concerned in that cause, were of the counsel in the present, and have told us without contradiction that the land in dispute in *Syler* and *Eckhart* lay upon the spurs of a mountain, and was altogether unimproved. when the sons took possession of it, and of little value compared with the value of its improved state. From the opinion of the court, delivered by the then Chief Justice, it is also to be inferred, that the parol agreement of the father was clearly proved, and that the sons, in consequence of it, took possession of the land, and made the improvements. The improvements, it may well be imagined, were almost the only thing which rendered it worth having. We know that lands of this description are often improved, and made valuable by a course of labor and industry that but few would be willing to bestow, even if the lands were offered to them as a *gift.* Indeed it is not easy for those, who have never taken such lands upon such terms, to form an adequate idea of the cost. Connected with such circumstances I am inclined to think that the decision in *Syler* and *Eckhart* may have been right. But how different is the case before us? The

(Eckert and others *v.* Eckert and others.)

land, at the time Peter took possession of it was well improved in every respect, except as to the dwelling house, which was considered probably of a character not equal to the quality of the land, which was of the very best, and so productive as to be worth a rent of four or five hundred dollars a year. And again, there is no evidence in this case, to shew that Peter took possession of the land in consequence of a *gift* or *sale* of any kind from his father.

The evidence here seemed to be of such dubious character, even in the minds of the counsel, for the plaintiffs, that they have at one time contended that it proved a gift, at another a sale; and in the last resort, that it clearly established either the one or the other, without undertaking to decide which of them. Surely it would be most perilous to suffer such testimony to deprive men of their real estates. It would be to sanction, and permit that species of fraud to prevail, which the legislature by the statute intended to guard against.

If from the evidence a sale could be fairly inferred, it would be that it was made after Peter had gone into possession of the land, and made the improvements, and presents the case of a parol sale of land, without any thing done under it, which is admitted to be within the statute. Besides there is not a tittle of evidence that Peter ever said a word to any person about his having purchased the land of his father, or in any way acknowledged his liability to pay his father, or his estate any thing for the land, nor yet of the father's ever having spoken of it to Peter, or in his hearing. Now without some evidence of Peter's having admitted his liability to pay, no action would, nor could be maintained against his personal representatives, or estate, to recover the money, 'and therefore, I doubt whether his heirs would be entitled to recover the land, even had the father of Peter, made a declaration in writing under his hand, that he had sold the land to Peter, for twenty-five hundred pounds, to be paid by him, but certainly not without first tendering the purchase money before commencing the suit; for otherwise they would get the land for nothing against the express terms of the agreement. *Lawrenson* v. *Butler,* 1 *Scho.* & *Lef.* 13.

As to the allegation, among other reasons for a new trial, that the charge of the court to the jury upon the testimony, and the facts in the cause, was in a way to take the decision of the facts from the jury, which is the only remaining one to be noticed, it appears to me that this reason is not supported in point of fact. For in the very brief notes, which we have, and which can be considered little more than the skeleton of the charge, it does appear that the judge submitted to the determination of the jury the fact of there having been a gift, or a sale of the land in dispute, by the father to the son, upon one or other of which grounds the plaintiffs rested their claim to the land. It is true that the judge told the jury that if there

(Eckert & others, *v.* Eckert and others.)

were any evidence of such gift or sale, he could not seeit; but he like-wise told them, that if they could see such evidence, that they should, as I understand it, find according to it.   His words are these "if the old man gave it for nothing, or if he agreed to sell and convey, and Peter has paid, if it ever was intended or understood, that the old man was to give a deed, it is one thing, and the cases read apply. I can find no evidence of such agreement, if you can you will do so;" which was leaving it to the jury to discover and say what the evidence was, and to find the facts accordingly, and then to apply the cases, that is the law as read by the counsel for the plaintiffs. This cannot be considered as either withdrawing the facts from the jury, nor yet controling them in the finding of the facts. The judgment must be affirmed.

Ross J. dissented.

Judgment affirmed.

---

ECKERT against MACE and others.

Rogers J.—Where, as here, there is no pretence of misdirection in point of law, and the judge who tried the cause is satisfied with the verdict in point of fact, nothing but an extraordinary case can excuse the granting of a new trial; no such case is presented here.   On the contrary the jury could not well have found any other verdict on the evidence, than that which we are asked to set aside.   *In no case can a parol conveyance of land be taken out of the statue of frauds, but by a particular equity arising from the payment of purchase money, or what is much the same, expenditure in improvements, made with the money of the donee, of which it would be a fraud in the donor to deprive him; and such an equity cannot be pretended by a volunteer.*   A parol gift to a son, which has induced no such expenditure, is as much within the statue, as if it were to a stranger.   The evidence here scarcely gave colour to the contract of sale which it was attempted to establish, or even to the existence of a gift.   It consisted in a great measure of loose expressions in the course of accidental conversations, in which the father spoke of his son as the owner of the farm, and of his having *put it* to him at a particular valuation.   This is explained by the testimony of *John Zach,* who proved, that the father said he had made a will in the life time of the son, in which he had put the land to him at twenty-five hundred pounds.   It is evident therefore, that he had estimated the value merely with a view to a division of his estate. When his son offered him three hundred dollars, and evidently with a view to entangle him in a contract, he refused it saying that he owed him nothing.   One witness indeed spoke of an admission that the money was to be paid at the father's death; but even this is inconsistent with the notion of a present purchase, as the postponement of payment could be referred to no other motive than to leave the whole subject to the father's control during his life: but it would be attended with extreme danger to deprive a man of his estate on evidence of loose and unguarded expressions at a time when the speaker was under no apprehension that his words would ever be brought up to affect his title, and when he was not apprised of its being necessary to explain his whole meaning with clearness and precision.   No witness speaks of his having admitted the existence of an engagement or obligation to vest the title in his son, either in his own life time or at his death without which the defendants can pretend no color of right, and if this were otherwise, what is the supposed consideration of the contract?   It is shewn that the son paid rather more than four hundred dollars in taxes, and in the erection of buildings.   By whom the residue of the expenses was defrayed is not shown; but it cannot be doubted that all that was paid by the son came out of the profits of the farm, (a valuable one) which it seems he had enjoyed for several years: for it is not pretended that he had any estate which he did not originally derive from his father.   There was therefore neither sale, consideration, gift nor expenditure.

(Eckert & others *v.* Eckert & others.)

Every one knows how common it is for parents to put in execution, during life, those testamentary arrangements which they meditate, to have consummated at their death; but still as testamentary arrangements they are consequently subject to revocation. The wisdom of their plan of distribution is thus submitted to experiment, while the parent is enabled to do something beneficial by anticipation, without endangering his bounty by the unthriftiness of his child. But no prudent man dare entrust the possession of an estate to his child, if loose and unguarded expressions which are very commonly, though inaccurately, used in reference to property thus enjoyed, were sufficient to deprive him of the title. Parents well know the value of subjection, and the danger which there is in making children independent: So that when a written conveyance has not accompanied the transfer of possession, it may safely be affirmed in ninety-nine cases in a hundred, that the parent meant to keep the staff in his own hands; and in such a case, what right has a jury to deprive him of it? Where a son having come of age, continues to reside with his father, or on his land, he takes his chance of obtaining compensation for his services, in his father's bounty; and if he be disappointed in his reliance upon that, he has no right to complain. Every man is the best judge of what is a just distribution of his estate according to his circumstances; and jurors who compel him to give his property differently, violate one of the most valuable privileges of a free man, the right to dispose of property by will. There *may* be such a thing as a sale to a child by parol, or a gift rendered valid by improvements, but such a case requires much stronger and clearer evidence than would be necessary to establish a similar transaction between strangers, which can be referred to nothing else than a contract, it ought to be proved fully, satisfactorily and almost beyond the possibility of mistake.

Tod, J. dissented.

Judgment affirmed.